[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14897
_____

D.C. Docket No. 2:11-cv-00464-WHA-WC


KESIA J. PERRY,
VALENCIA AARON,
STACY D. TAYLOR,

                                                      Plaintiffs-Appellants,

versus


JEFF ROGERS,
Chief, in his individual capacity,
STAN GOOLSBY,
in his individual capacity,
KENNETH DAVIS,
Lt., in his individual capacity,
JEAN TURNER,
in her individual capacity,
ALABAMA ALCOHOLIC BEVERAGE CONTROL BOARD,

                                                      Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(September 29, 2015)

Before ED CARNES, Chief Judge, JORDAN and ROSENBAUM, Circuit Judges.

PER CURIAM:

Kesia Perry, Valencia Aaron, and Stacy Taylor brought various claims against their employer, the Alabama Alcoholic Beverage Control Board ("ABC Board"), including claims of race discrimination, race-based hostile work environment, and retaliation. After conducting a review of the record, the district court determined that the ABC Board was entitled to summary judgment on all claims advanced by Appellants. Perry, Aaron, and Taylor now appeal the district court's grant of summary judgment in favor of the ABC Board on their hostile work environment claims. Perry also appeals the district court's grant of summary judgment in favor of the ABC Board on her retaliation claim. Appellants have abandoned all other claims previously advanced.

Although Perry, Taylor, and Aaron presented instances during which supervisors allegedly made offensive racial remarks, we find that they have not presented a genuine issue of material fact as to whether the alleged harassment was objectively severe or pervasive enough to establish a racially hostile work environment. And, because no genuine issue of material fact exists, we affirm the

2

district court's grant of summary judgment in favor of the ABC Board on these claims. But we conclude that Perry presented sufficient evidence to preclude the entry of summary judgment with respect to her retaliation claim. We therefore vacate the summary judgment against her on this claim.

## I.

### A. General Background

The ABC Board is an agency of the State of Alabama that controls the sale of alcoholic beverages through distribution, licensing, and law enforcement. It operates retail stores that sell liquor, and it also licenses businesses that sell alcoholic beverages. The ABC Board employs more than 120 sworn law-enforcement officers and administrative personnel. As an agency of the State of Alabama, the ABC Board is subject to the rules and regulations of the State Personnel Department ("SPD"). Both the SPD and the ABC Board have established policies that prohibit discrimination against any employee based upon race.

The Administrator, who is the final decision maker for all hiring, firing, disciplinary, and promotional decisions for ABC Board employees, runs the ABC Board. During the period relevant to the facts of this case, Emory Folmar, a Caucasian male, was the Administrator of the ABC Board.

The ABC Board's Law Enforcement Division's command center for statewide operations is located in Montgomery, Alabama. The Law Enforcement Division also maintains eleven enforcement district offices across the State of Alabama. In addition, at times, the Law Enforcement Division operated a Drug Unit. A "Chief" heads the Law Enforcement Division of the ABC Board, and a "Captain" reports to the Chief. During the period relevant to this case, Charles Jeffrey Rogers, a Caucasian male, served as a Chief, and John Richardson, an African-American male, was a Captain.

## B. Kesia Perry

In August 2007, Perry began her employment with the ABC Board as an Administrative Support Assistant II ("ASA II") and remained in this position until January 2012. As an ASA II, Perry was responsible for filing and retrieving documents, as well as answering the telephone. Perry, who is African-American, asserts that she was subjected to racially charged remarks by her co-workers, supervisors, and administrators. Perry also points to incidents of alleged disparate treatment, which she argues contributed to a racially hostile work environment. With respect to her retaliation claim, Perry contends that she was retaliated against for opposing discrimination, filing an internal complaint with the SPD, and filing an EEOC charge.

4

In July 2009 one of Perry's supervisors, Mark Hatfield, addressed performance problems with Perry, including criticism that Perry took too many personal phone calls at work. During the counseling session, Perry became upset and complained that coworkers "had a racist attitude" towards her and other African-American employees, though Perry did not specify any particular events or indicate the individuals whom she believed to be racist. Work appraisals of Perry during that year indicate that Perry received high performance scores.

In early 2010, Perry's first-line supervisor, Diane Sullivan, retired, and Perry expressed interest in being cross-trained for Sullivan's position. The ABC Board, however, filled the vacancy with Chief Rogers's sister-in-law, Summer Childers, a Caucasian female. Upon hiring Childers, the ABC Board requested that the SPD match Childers's salary from her previous job with a bank. In late April 2010, Perry and another employee, Linda Flores (Caucasian), accessed their coworkers' salaries online and discovered that Childers's pay was higher than Perry's. As a result, Perry complained to Rogers, Hatfield, and Personnel Director Stan Goolsby about the pay discrepancy. Goolsby explained to Perry that the difference in pay was based on the ABC Board's salary-matching policy. Hatfield later counseled Perry for reviewing her coworkers' salaries online. Hatfield also issued a written warning (the first step of the progressive discipline policy) to Flores for her participation in the event.

5

A few weeks later, in late June 2010, Rogers informed Perry that the ABC Board had decided to transfer her from its Central Office to District 10. The transfer was Hatfield's idea, and he explained that he believed that the transfer would provide Perry with different work responsibilities, which would offer her a better opportunity for promotion. Perry objected initially but later indicated that she would accept the transfer and do her best. Although Rogers stated that Perry's transfer was not punitive, a later email indicates that the reason for Perry's transfer was due to a "disgruntled/disciplinary issue."

Sometime in 2010, Perry began dating another African-American ABC Board employee, Andy Lard. The ABC Board conducted an internal-affairs investigation of Lard, which resulted in his arrest and indictment for taking seized money from evidence. As part of the investigation, an ABC Board supervisor questioned Perry about her relationship with Lard—a process that Perry referred to as an "interrogation." During the ABC Board's investigation of Lard, Rogers sent an email to the entire Enforcement Division instructing employees not to speak to Lard. Perry was also asked to sign a document stating that she would not remove any documents from the ABC Board's offices. Perry became overwhelmed with stress due to the incident and took FMLA leave beginning on August 9, 2010.

On the same day that she went out on FMLA leave, Perry filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"),

6

complaining of race discrimination by the ABC Board. In support of her charge, Perry cited Childers's higher pay, Perry's transfer to District 10, and Perry's perceived harassment with respect to Lard. Approximately one week later, on August 18, 2010, Perry filed a complaint with SPD alleging that the ABC Board had discriminated against her based on her race when it transferred her to District 10.

When Perry returned from FMLA leave in November 2010, the ABC Board transferred her from District 10 back to the Personnel Division in ABC's Central Office. The ABC Board transferred Perry because her doctor indicated that she could not return to work in District 10 due to stress.

In the Central Office, Goolsby became Perry's direct supervisor. Soon after Perry returned to work, newly appointed ABC Administrator Mac Gipson met with Perry and encouraged her to drop her EEOC charge. According to Perry, Gipson told her that it would be best if she did not pursue the lawsuit because it was like suing family members and friends. Gipson told Perry that she "just needed to think twice about it."

On June 14, 2011, Perry filed the underlying lawsuit alleging race discrimination, hostile work environment, and retaliation. Perry named Goolsby as an individual plaintiff in the action. About one month after Perry filed suit, Goolsby assigned another ABC Board employee, Andy Knight, to supervise Perry,

7

even though Knight had not supervised anyone for several years. Perry was Knight's sole subordinate at the time. Goolsby instructed Knight to keep a close watch over Perry and to use progressive discipline, if necessary.[1] Knight later admitted that Goolsby told him that he expected that Perry, because of her personality, "would either hang herself or she would become so upset that she would quit." In fact, Goolsby told Knight on a number of occasions, "maybe she'll quit."

While under Knight's supervision, Perry was responsible for working the switchboard and ensuring that it was properly staffed during breaks. According to Knight, however, problems between Perry and other switchboard operators led to instances where the switchboard was left unattended. Knight therefore counseled Perry about punctuality, cooperation with coworkers, and compliance with the ABC Board's rules. In response, Perry complained that her coworker, Linda Caldwell, was difficult to work with and did not cover the switchboard when she was supposed to. Since Knight was not Caldwell's supervisor, he spoke with Caldwell's supervisor about the issues that Perry brought up.

During the course of her supervision under Goolsby and Knight, Perry received two disciplinary actions—a written reprimand for tardiness and insubordination and a suspension for violating leave policies and procedures. The

---

[1] According to Goolsby, he assigned Knight to supervise Perry to provide a "buffer" between himself and Perry.

8

ABC Board alleged that Perry failed to comply with policies, leaving for a period of several days from December 29, 2011, through January 5, 2012. According to Perry, however, she called Goolsby, explaining that she would not be able to get to work on time because she needed to assist her father, who had recently had a heart attack, in transferring to a new medical facility. Based on Knight's recommendation, Perry received a three-day suspension (from January 13, 2012, through January 17, 2012).

Before Perry left for her suspension, Knight asked Perry to create a staffing schedule for the switchboard for the days that she would be out. Perry forgot to draft the schedule. When Perry returned to work on January 18, 2012, Knight confronted Perry and chided her that she had acted insubordinately. After her encounter with Knight, Perry returned to her work station, but by mid-morning, she left the building. When Perry did not return to work after a few days, Goolsby sent her a letter indicating that her actions constituted job abandonment and voluntary resignation. The ABC Board terminated Perry on January 24, 2012.

Knight stated that after Perry was fired, Goolsby walked by and said, "Man, you set her up," and motioned with a thumbs up. Rogers also congratulated Knight and told him that he "had done what they had not been able to do."

## C. Stacy Taylor

In March 2007, Taylor began his employment with the ABC Board as an Agent in the Law Enforcement Division.[2]  Taylor held this position until he resigned on January 29, 2010.  Like Perry, Taylor is African-American and asserts that he was subjected to a racially hostile work environment.  Taylor also points to alleged incidents of disparate treatment, which he contends contributed to a racially hostile work environment.

Taylor's first appointment with the ABC Board was to the District 3 office located in Birmingham, Alabama.  At that time, Taylor was the only African-American in the office.  Taylor believed that he was excluded from work and social activities by other Caucasian agents.  After Taylor discussed the situation with the other agents, however, they began to include him.

In September 2007, Taylor requested a transfer to District 13, the Drug Unit of the ABC Board in Montgomery.  Rogers denied the request, stating that the ABC Board was not accepting transfers to the Drug Unit at the time.  A few weeks later, Taylor sent a request to be transferred to District 10, also in Montgomery.  Taylor's request explained that he was involved in divorce proceedings and needed to be closer to his children.  Taylor followed up with his transfer request in

---

[2] Agents have several duties, including (1) investigating illegal activities, such as alcohol and tobacco violations; (2) completing forms such as incident/offense reports and applications for search and arrest warrants; and (3) completing ABC license applications.  Agents are also required to complete security details at the ABC Board's warehouse, located in Montgomery.

October and again in December. In early January 2008, Taylor received a transfer to District 10. A few months later, Taylor renewed his request to transfer into the Drug Unit, but the request was denied.

In December 2008, Lieutenant Dennis Hill assigned Taylor to work at the ABC Board's warehouse for a week as discipline for Taylor's low statistics at work.[3] The job is perceived to be undesirable because it is hot and dirty in the warehouse. Taylor complained that the warehouse assignment was due to his race, and Hill forwarded the complaint to the ABC Board's Central Office. While working at the warehouse, Taylor was not permitted to use a golf cart to ride around the warehouse, even though he observed Caucasian agents using the golf cart on numerous occasions.

On October 23, 2009, Lieutenant Jean Turner replaced Hill as Taylor's supervisor in District 10.[4] Approximately one month later, an inspection of the cars in District 10 revealed that Taylor's new Dodge Charger had a dent on the passenger side door. Taylor had not reported the dent in the state-owned vehicle. Turner issued Taylor a written warning for failing to maintain his car. On the same

---

[3] The ABC Board required its enforcement agents to complete security details at the warehouse during which the agent ensured that the warehouse workers did not steal any inventory.

[4] Turner had a reputation as being the person who would terminate employees that Chief Rogers wanted gone.

date, and as a result of the same inspection, Turner disciplined Gary Humphrey, a male Caucasian agent, for the condition of his vehicle.

A few months later, Turner met with Taylor and told him that he was not performing his job correctly and that he would be transferred to Dothan, effective February 1, 2010. Turner reviewed Taylor's cases with him, which revealed unfavorable statistics indicating that Taylor had not been completing cases. Turner explained to Taylor that a transfer to a smaller division might help Taylor with his productivity. Taylor objected to the transfer. The day after Taylor met with Turner, he completed an EEOC intake questionnaire alleging race discrimination. Two days later, the EEOC sent Goolsby a notice that Taylor had filed the grievance.

On January 25, 2010, Taylor submitted a letter of resignation but completed the work week. The letter explained the reason that he was resigning as financial hardship relating to his pending transfer to Dothan. After his employment ended, on February 18, 2010, Taylor filed a charge of discrimination with the EEOC.

### D. Valencia Aaron

In January 2006, Aaron began her employment with the ABC Board as an Agent in the Law Enforcement Division. Aaron worked at the ABC Board for approximately five-and-one-half years before she filed the underlying lawsuit. Like Perry and Taylor, Aaron is African-American and asserts that she was

12

subjected to a racially hostile work environment. In addition, Aaron points to incidents of disparate treatment, which she claims also contributed to a racially hostile work environment.

The ABC Board hired Aaron as an Agent in District 3, where her employment began with a six-month probationary period. Aaron attended a training academy that the Division conducted for new agents. On April 7, 2006, Aaron received an evaluation in which Michael Jones, who then commanded District 3, recommended that Aaron's probationary status be extended because she lacked the necessary certification for handling a firearm as an enforcement officer. According to the ABC Board, it also extended the probationary period of several Caucasian Agents in similar situations. On October 20, 2006, Aaron completed her probationary period and became a permanent agent for the ABC Board.

A month after becoming a permanent agent, Aaron requested a transfer from Jefferson County to the Drug Unit in Montgomery, so she could be closer to her husband and child. The ABC Board approved the request in March 2007, with Aaron's transfer to the Drug Unit becoming effective on April 1, 2007. During her tenure at the Drug Unit, Aaron performed undercover work. At some point, Aaron asked her supervisors if she could serve as a trainer. In response, one of the supervisors, James Collins, an African-American male, told Aaron that no application process existed for the training task force and explained that trainers

13

were simply selected.  The other supervisor, Captain Vance Patton, a Caucasian male, did not respond to Aaron's inquiry.

In June 2008, while still working in the Drug Unit, Aaron became pregnant and was unable to perform her undercover duties.  Aaron was initially assigned to light-duty work, and her supervisor kept a close watch over her productivity.  On October 1, 2008, the ABC Board reassigned Aaron from the Drug Unit to District 10, also in the same building in Montgomery.  The ABC Board explained to Aaron that it was transferring her because her undercover position was paid for by a federal grant which required her to do undercover work.  Since Aaron could not perform undercover work during her pregnancy, Aaron's salary was no longer covered by the grant.  Because the ABC Board filled her position in the Drug Unit during her pregnancy, Aaron did not return to her position after her maternity leave ended.

In October 2009, Lieutenant Jean Turner became Aaron's supervisor in District 10 after Dennis Hill was removed from the position.  Upon her arrival in District 10, Turner told Aaron that she was not there to "get" Aaron.  During the same timeframe, Agent Richard Holston, who had also been transferred to District 10, told Aaron that Rogers and another supervisor had instructed him to keep watch over Aaron.

14

On August 9, 2010, while on FMLA leave for knee surgery, Aaron went with Perry to an EEOC office to fill out an intake questionnaire and a charge of discrimination. The paperwork indicated that Aaron believed that she had been denied a promotion based on her race and sex. The following day, Aaron filed a grievance with the SPD alleging race discrimination. After filing her charge and while still on FMLA leave, Aaron noticed what she perceived to be several instances of ABC surveillance in her neighborhood. She also claimed that she saw an ABC Board agent following her while she was shopping.

During Aaron's FMLA leave, her supervisor, Lieutenant Davis, completed a performance review of Aaron. Although the appraisal contained lower scores than prior evaluations, Davis stated that Aaron was on the high end of "meets standards."

Upon her return from FMLA leave for knee surgery, Aaron was twice assigned to work a detail at a store in Auburn, Alabama, during a football game. Aaron was unhappy with the assignment for multiple reasons, including the fact that the detail required Aaron to put strain on her knee. Aaron also claimed that she had previously completed a similar assignment before her FMLA leave and contended that another agent, who was Caucasian, had not been assigned to the detail.

During the same timeframe, Aaron noticed that Lieutenant Davis began returning her paperwork with multiple corrections and "red marks." Davis also scrutinized the paperwork of another African-American agent, Stephen McKitt. In contrast, according to Aaron, Davis did not correct or return paperwork to two Caucasian agents, Jeremy Peterson and Craig Shook, despite multiple errors on their papers. Davis also instituted new policies that Aaron believed were directed towards her. For instance, one of the policies included a requirement that all personnel complete their breakfast by 8:00 a.m. A few days prior to the rule change, Davis saw Aaron and McKitt having breakfast together in the break room. Davis told Aaron and McKitt that they would no longer be able to have breakfast together.

On January 7, 2011, Aaron attended a meeting during which Davis asked everyone to express their opinions on how District 10 was being run. Aaron opined that Davis's actions were retaliatory. The following day, Davis sent an email to Rogers indicating that he believed that Aaron was disruptive and that her conduct in the office made other employees uncomfortable. Aaron was subsequently written up for her actions. Aaron submitted a rebuttal to the counseling in which she characterized the counseling as further retaliation against her.

A few days later, Davis authored an e-mail to all District 10 enforcement personnel announcing a new physical training policy. Previously, agents were allowed to use time at the beginning or end of their shifts to work out. According to Aaron, she and McKitt were the only agents who used the morning and afternoon time slots for working out. Following the policy change, they could not.

On June 14, 2011, Perry filed her initial Complaint in the underlying matter and, on June 20, 2011, she amended her Complaint to add Aaron as a plaintiff. Aaron was still employed by the ABC Board when she filed her complaint.

## II.

We review *de novo* the district court's grant of summary judgment drawing all inferences and reviewing all evidence in the light most favorable to the non-moving party. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012); *Crawford v. Carroll*, 529 F.3d 961, 964 (11th Cir. 2008). A district court should grant summary judgment only if the movant establishes the absence of a genuine issue of material fact. *Id*.

## III.

### A. Perry's Retaliation Claim

Title VII's anti-retaliation provision states, in relevant part, that it is unlawful for an employer to retaliate against an employee "because [s]he has

opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3; *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (per curiam).  To establish a claim for retaliation under Title VII, an employee must prove that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) some causal relation exists between the two events.  *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405 (2006)).

If a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to proffer a legitimate non-retaliatory reason for the materially adverse action.  *Crawford*, 529 F.3d at 976.  If the defendant proffers a legitimate non-retaliatory reason for its actions, the burden shifts back to the plaintiff to demonstrate that the proffered reason is merely pretext and that the real reason was retaliatory.  *Id; see also Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (setting forth the burden-shifting framework for a retaliation case).  The plaintiff cannot establish pretext by merely pointing to facts that demonstrate retaliatory animus.  Rather, she must respond specifically to each of the defendant's explanations and rebut them.  *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).

To establish a claim of Title VII retaliation claim, a plaintiff must also demonstrate that the desire to retaliate was the "but-for" cause of the challenged employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, __ U.S. __, 133 S. Ct. 2517, 2528 (June 24, 2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 2533.

Here, the ABC Board conceded that Perry engaged in protected activity on May 3, 2010, when she complained to Goolsby about pay disparity; on August 9, 2010, when she filed a charge of discrimination with the EEOC; on August 18, 2010, when she filed a complaint of discrimination with the SPD; and on June 14, 2011, when she filed the underlying complaint in this case. In analyzing Perry's retaliation claims, the district court assumed, without holding, that Perry exhausted her administrative remedies. But the district court determined that the instances of retaliation either did not constitute materially adverse actions or were not causally related to Perry's protected activity. The district court further found that, even if the alleged acts of discrimination were sufficient to make out a *prima facie* case of retaliation, Perry did not establish that the retaliation would not have occurred "but for" her involvement with protected activity. We disagree with the district court on both counts.

19

An action is materially adverse if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68, S. Ct. at 2415 (internal quotation marks and citation omitted).

A plaintiff can establish causation by demonstrating that the protected activity and the materially adverse action were not "completely unrelated." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).  Close temporal proximity between the protected activity and the materially adverse action can satisfy the causation element, "[b]ut mere temporal proximity, without more, must be very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (citation and internal quotation marks omitted).  Thus, when a plaintiff relies on temporal proximity alone, a substantial delay between the protected expression and the materially adverse action will result in the failure of the retaliation claim. *Id.*  We have previously found that a "three to four month gap is insufficiently proximate to establish causation." *Id*.

Perry asserts that the ABC Board retaliated against her in violation of Title VII because she opposed discrimination, filed an internal complaint with the SPD, and filed an EEOC Charge.  The specific acts of alleged retaliation to which Perry points are her transfer to District 10, alleged subtle reprisals against her, written reprimands, and a three-day suspension after she was transferred to District 10.  While most of the acts do not constitute retaliation, we conclude that Knight's

20

close supervision of her was an act of retaliation.  We review each alleged adverse action in turn.

First, Perry has not shown that her transfer to District 10 was a materially adverse action.  A transfer to a new position can be deemed to be adverse if it involves a reduction in pay, prestige, or responsibility.  *Hinson v. Clinch Cty., Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000).  Here, however, Perry was transferred to a position with similar job duties, and no evidence suggests that Perry suffered a reduction in pay.  Accordingly, Perry has not shown that she suffered any tangible harm as a result of her transfer to District 10.

We recognize that a transfer that results in a diminished opportunity for increases in salary constitutes a materially adverse action.  *See Bass v. Bd. of Cty. Comm'rs of Orange, Cty., Fla.,* 256 F.3d 1095, 1118-19 (11th Cir. 2001), overruled in part on other grounds by *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008).  But here, Perry's supervisors testified that Perry was placed in a better position to be promoted after her transfer to District 10.  Indeed, Hatfield, stated that the transfer to District 10 would provide Perry with a greater opportunity to become an ASA III.  The record also shows that the transfer placed Perry closer to home and her children's school.  Perry simply has not produced any evidence suggesting that the transfer affected her in a materially adverse way.

Second, although it is not clear precisely upon which disciplinary acts Perry relies as evidence of retaliation, it appears that she points to the fact that she received counseling after complaining about Childers's pay.  This counseling cannot support a claim for retaliation, however, because it does not constitute a materially adverse action.  Aside from the fact that Perry was unhappy about receiving the counseling, she has not demonstrated that it negatively impacted her in a material way.  As a result, the counseling was not the type of action that might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  *See Burlington*, 548 U.S. at 68, 126 S. Ct. at 2415.  The record further demonstrates that the counseling did not constitute formal discipline under the ABC Board's policies.  In contrast, the other individual involved in reviewing Childers's pay online, Linda Flores, who is Caucasian, received a written warning, which serves as the first step in the ABC's Board's progressive discipline policy.

Perry also appears to point to the fact that she received a written reprimand by Goolsby for tardiness and insubordination in April 2011 as evidence of retaliation.  Again, Perry has failed to set forth any evidence showing how this written reprimand negatively affected her in a material way.  *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1240 (11th Cir. 2001) (although a written reprimand could constitute a materially adverse action, it must be accompanied by some tangible harm).  Even assuming that the reprimand was a materially adverse

22

action, no causal connection exists between it and any protected activity. Perry engaged in protected activity in May 2010, August 2010, and June 2011. The reprimand, however, did not occur until April 2011, at least seven months after the last protected activity. This timeframe is too remote to support an inference of causation. *See Thomas,* 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough").

Third, Perry points to her suspension in January 2012 as evidence of retaliation. Because the issue was not raised before the district court,[5] we do not address the suspension on appeal.[6] But, even if Perry had raised the issue of her suspension previously, no causal connection exists between the suspension and any protected activity. Perry filed her lawsuit in June 2011, and her suspension occurred in January 2012. Thus, Perry's suspension occurred approximately seven months after Perry's last protected activity. In view of this timespan, Perry cannot establish causation based upon temporal proximity. *See id.* Nor does she point to any other evidence to establish causation.

---

[5] The district court noted that Perry did not "appear to argue that her three-day suspension was an act of retaliation."

[6] We generally do not consider on appeal issues which the party failed to raise before the district court. *See Access Now, Inc. v. Southwest Airlines, Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

Finally, Perry contends that her placement under Knight's supervision and his subsequent close monitoring and disciplinary decisions constituted an act of retaliation for filing her lawsuit. Perry filed her lawsuit on June 14, 2011, and Goolsby assigned Knight as her supervisor the following month—in July 2011— even though Knight had not supervised anyone for several years. Perry was Knight's sole subordinate at the time, and Goolsby instructed Knight to keep a close watch over Perry and to use progressive discipline, if necessary. Knight admits that Goolsby told him that as a result of this close supervision and because of her personality, Perry "would either hang herself or she would become so upset that she would quit."

During his tenure as Perry's supervisor, Knight counseled Perry about punctuality, cooperation with coworkers, and compliance with the ABC Board's rules. Perry also received two disciplinary actions—a written reprimand for tardiness and insubordination and a suspension for violating leave policies and procedures. Both of these acts constitute materially adverse actions. And, because Goolsby placed Perry under Knight's supervision the month after she filed her lawsuit, a reasonable jury could find that the causation element is met. *See Higdon*, 393 F.3d at 1220. While we recognize that the ABC Board claims that it decided to have Knight supervise Perry to place a "buffer" between Goolsby—a person who was named as an individual defendant in the case—and Perry, it is also

24

plausible that the ABC Board did so to have Knight further scrutinize Perry's actions.

Further, although a jury might find that the ABC Board had legitimate reasons for disciplining Perry, it might also find that Perry adequately rebutted these reasons by offering the testimony of Knight. Significantly, Knight stated that after Perry walked off the job, Goolsby approached him exclaiming, "Man, you set her up," while making a thumbs-up gesture. Rogers also congratulated Knight and told him that he "had done what they had not been able to do."

Taking the facts in the light most favorable to Perry, we find that a genuine issue of material fact exists as to whether the ABC retaliated against Perry after she filed her lawsuit. Based on the close temporal proximity between the filing of Perry's complaint and the subsequent disciplinary activity, a reasonable jury could conclude that Perry would not have been closely watched and then disciplined by Knight in the absence of her protected activity. Accordingly, we reverse and remand with respect to Perry's retaliation claim.

## B.  Appellants' Claims of a Racially Hostile Work Environment

To succeed on a claim of hostile work environment, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Adams v. Austal,*

25

*U.S.A., L.L.C.*, 754 F.3d 1240, 1248 (11th Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993)); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). An employee wishing to establish a race-based hostile work environment claim must prove that (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on her race; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such environment under either a theory of vicarious or direct liability. *Adams*, 754 F.3d at 1248-49 (citation omitted); *Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012).

Here, the district court determined that Appellants failed to meet the fourth element of their *prima facie* cases because they presented no evidence that the conduct complained of was severe or pervasive enough to constitute a hostile work environment.[7] The inquiry regarding the fourth element—whether the harassment was sufficiently severe or pervasive—contains both a subjective and objective component. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc). "The employee must subjectively perceive the harassment as

---

[7] Because it resolved the motion for summary judgment on the fourth element, the district court did not address whether the fifth element was met, even though the ABC Board raised it in support of its motion for summary judgment.

26

sufficiently severe and pervasive to alter the terms or conditions of employment, . . . [and] the objective severity of the harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Adams*, 754 F.3d at 1249 (citations omitted) (internal quotation marks omitted). To be actionable, the behavior must result in both "an environment 'that a reasonable person would find hostile or abusive' and an environment that the victim 'subjectively perceive[s] . . . to be abusive." *Miller*, 277 F.3d at 1276 (quoting *Harris*, 510 U.S. at 21-22).

With regard to the objective severity of the alleged harassment, the inquiry is fact intensive, with the court considering four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Adams*, 754 F.3d at 1250-51 (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)); *McCann v. Tillman,* 526 F.3d 1370, 1378 (11th Cir. 2008). "The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Reeves*, 594 F.3d at 809 (citation omitted) (internal quotation marks omitted).

A plaintiff can prove a hostile work environment by showing severe or pervasive discrimination "directed against her protected group, even if she herself

is not individually singled out in the offensive conduct." *Id*. at 807.  Accordingly, a plaintiff may have a viable hostile work environment claim even if racial slurs were not directed at her.  *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995).  But a plaintiff must have knowledge of the remarks in order for her claim to have merit.  *Adams*, 754 F.3d at 1250.  As we have explained, "The totality of a plaintiff's workplace circumstances does not include other employees' experiences of which the plaintiff is unaware.  Courts conduct the objective assessment from the perspective of a reasonable person in the plaintiff's position, knowing what the plaintiff knew."  *Id.*  (citation omitted); *see also Edwards*, 49 F.3d at 1522 (noting that some of the incidents relied upon by the plaintiff were not made known to her until after her termination and, thus, they could not have contributed to her subjective view of a hostile work environment).

In this case, viewing the facts in a light most favorable to Appellants, though, we cannot say that reasonable jurors could conclude that Perry, Taylor, or Aaron suffered severe or pervasive harassment sufficient to alter the terms and conditions of their employment.  Consequently, we find that the district court did not err when it granted summary judgment in favor of the ABC Board with respect to their hostile-work-environment claims.

**(1) Perry**

Perry bases her hostile work environment claim on what she perceived to be a "racial attitude" at the ABC Board.  In support of her claim, Perry cited to two specific instances, of which she has personal knowledge, during her four-and-one-half years employed with the ABC Board.

First, Perry stated that she saw a Confederate flag on the personal vehicle of an ABC Board employee.  But Perry presented no evidence as to when or how frequently she saw the flag.

Second, Perry recounted a conversation involving a reference to the Ku Klux Klan.  Specifically, during a conversation that she had with ABC Board employees Bob Martin[8] and Stan Goolsby, Perry voiced her opinion that Goolsby, the Personnel Director, allowed employees to refer to African-American employees as "niggers" and "nigger bitches."  Perry admitted that she had not heard such comments, however.  During the conversation, Martin allegedly responded, "I am not going to say that people here don't go to the dry cleaners and get their white robes out of the cleaners [but . . .] [t]hose are bad people, but you know, what can we do?"  Martin then told Perry that if she heard anyone using the "n" word or other racial slurs, she should let him know.  This remark alludes to the Ku Klux Klan and suggests the existence of an unacceptably casual attitude by the ABC

---

[8] Martin was the attorney for the ABC Board.

29

Board to its employees' racial intolerance ("what can we do?").  But, ironically, the overall gist of the remark appears to have been intended to reassure Perry that the ABC Board would take action against employees who engaged in racially intolerant behavior in the workplace.  And, in any case, it was an isolated incident, and Perry has pointed to no evidence of similar conversations.

Significantly, during her deposition, Perry admitted that she never personally heard any ABC Board employee use the "n-word" or any other racial slurs or epithets.  Rather, she stated that she was aware of rumors that Folmar and Rogers used racial slurs when referring to African-American employees.  Perry also conceded that she never saw any racist symbols or graffiti at her workplace.  Nor did Perry ever encounter any racially insensitive jokes while employed by the ABC Board.

In the absence of personal knowledge of race-based conduct, Perry seeks to rely on the testimony of other ABC Board employees who spoke of instances where Rogers allegedly used racially derogatory language.  But we cannot consider evidence of the alleged racial harassment of other employees of which Perry was not aware in determining the viability of Perry's hostile work environment claim. *See Adams*, 754 F.3d at 1250 (district court should not consider evidence of other employees' experiences of racial harassment of which the plaintiff is not aware); *see also Edwards*, 49 F.3d at 1522.  Apart from potential hearsay problems with

30

respect to some of the alleged racially charged statements, insufficient information exists as to when the statements were made, how Perry acquired knowledge of them, and when Perry learned of them. Perry refers only vaguely to statements allegedly overheard by co-workers. And other evidence in the record suggests that Perry acquired the information through only discovery in this matter, not through her work environment. *Id*. Of course, Perry's workplace experience does not include other employees' experiences of which Perry was unaware. *See Adams*, 754 F.3d at 1250. Moreover, contrary to her position on appeal, during her deposition, Perry testified that she did not encounter any events during her employment at the ABC Board that created a racially hostile work environment.

In addition to the two instances of racially charged conduct of which she was aware, Perry identifies what she considers to be discrete acts of disparate treatment to support her claim that she was exposed to a racially hostile work environment. *Cf. Reeves*, 594 F.3d at 807 (disparate treatment can take the form of a hostile work environment).[9] Because Perry has not demonstrated that any of these instances were racially motivated, however, she cannot rely on them in support of her hostile-work-environment claim. *See Jones*, 683 F.3d at 1297 (only conduct that is based on a protected category, such as race, may be considered in a hostile-work-environment analysis). We address each discrete act in turn.

_____

[9] We assume without deciding that discrete acts of disparate treatment can be used in analyzing a hostile work environment claim.

31

First, Perry has not come forth with any evidence to suggest that her transfer to District 10 was racially motivated, except for her own perception that race played a role in the transfer. The record reveals that it was not uncommon for the ABC Board to transfer agents. For instance, Caucasian agents Ted Yost, Cindy Yost, and Darrell Wallace were all transferred as part of a corrective plan.

Next, with respect to Perry's claim that she received excessive discipline after her transfer to District 10, the record does not support a finding that the discipline was due to Perry's race. While Perry points to the fact that she was counseled after reviewing Childers's salary online, the Caucasian employee involved in the incident, Linda Flores, received more severe discipline—a written warning (the first step of the ABC Board's progressive discipline policy). Similarly, although Perry was told that she could no longer take breaks with Flores after the incident, this repercussion affected both Perry and Flores equally.

Regarding Perry's complaint that she was "watched" at work after her transfer to District 10, Perry did not come forward with any evidence that would support a finding that this action was taken as a result of racial animus. Indeed, we rejected a similar claim made by Perry's co-worker, Steve McKitt last year. *See McKitt v. Alabama Alcoholic Beverage Control Board*, 571 F. App'x 867 (11th Cir. 2014).

32

Finally, with respect to Perry's assertion that a "white employee [got] her [job duties[,]" she refers to the fact that Childers was selected by the ABC Board when Sullivan retired. Even if Perry could demonstrate any disparate treatment with respect to the decision, this single event, even when viewed in conjunction with the two racially motivated events experienced by Perry, would not be enough to prevent the entry of summary judgment in favor of the ABC Board on Perry's hostile-work-environment claim.

In the roughly four-and-one-half years that Perry was employed with the ABC Board before filing her complaint of discrimination, she experienced two instances of racial hostility. While unacceptable, this conduct was not frequent enough to be considered pervasive. Additionally, the conduct was not physically threatening to Perry and did not unreasonably interfere with her job performance.[10]

Under these circumstances, an objective person in Perry's position would not perceive the totality of the circumstances as producing a racially hostile work environment. Because Perry has not shown that a genuine issue of material fact exists with respect to her hostile-work-environment claim, we affirm the district court's grant of summary judgment in favor of the ABC Board. *See Adams*, 754 F.3d at 1255-56.

---

[10] Perry admitted during her deposition that her knowledge of other ABC Board employees' alleged use of racial slurs did not interfere with her ability to do her job.

33

**(2) Taylor**

As with Perry, in addition to discrete acts of alleged racial discrimination, Taylor points to the use of racial slurs in the workplace to support his hostile-work environment-claim. The record reflects, however, that the statements upon which Taylor seeks to rely were made outside of his presence, and Taylor did not acquire knowledge of the alleged slurs until *after* his employment with the ABC Board ended.

During his deposition, Taylor stated that he had never seen any racially charged symbols or graffiti while employed at the ABC Board. Taylor also admitted that he had never heard another employee use a racial slur or make a racially insensitive joke while at the ABC Board. Nor did Taylor observe any racial symbols or graffiti at the ABC Board. Similarly, Taylor did not witnesses any Confederate flags displayed in the workplace. Taylor points out only that he heard a rumor that Folmar used racial slurs.

Although Taylor attempts to rely on the same use of racial slurs that Perry tried to invoke, Taylor admits that his knowledge of these events came *after* he resigned from the ABC Board. Indeed, Taylor conceded that his knowledge of the alleged use of racial slurs by Folmar and Rogers came from Aaron and Perry, who had apparently heard rumors in this regard.

34

Because Taylor was not aware of the use of racial slurs while he was employed by the ABC Board, they could not have contributed to any subjective belief that he was exposed to a hostile work environment. Although a plaintiff may have a claim for hostile work environment even if racial slurs were not directed towards him, he cannot support his claim with events that were unknown to him during his employment. *Adams*, 754 F.3d at 1250 (district court should not consider evidence of other employees' experiences of racial harassment of which the plaintiff is not aware); *Edwards*, 49 F.3d at 1522 (noting that some of the incidents relied upon by the plaintiff were not made known to her until after her termination and, thus, they could not have contributed to her subjective view of a hostile work environment).

Because Taylor cannot point to any racial slurs of which he was aware during his employment with the ABC Board, we do not consider the other discrete acts upon which Taylor relies for his hostile-work-environment claim. Discrete acts alone cannot form the basis of a hostile-work-environment claim. *See Gowski*, 682 F.3d at 1312-13.

### (3) Aaron

Although Aaron comes closer to defeating summary judgment with respect to her hostile-work-environment claim, we nonetheless must conclude that she also did not set forth sufficient facts to create a genuine issue of material fact as to this

claim.    In contrast to Perry and Taylor, Aaron demonstrated that she had knowledge of the repeated use of racial slurs by her superiors.  Aaron also based her claim on various discrete acts that she asserts contributed to a racially hostile work environment.  Although Aaron is unable to demonstrate how most of these discrete acts were racially motivated, we find that a reasonable jury could determine that two of the discrete acts to which Aaron points evidence racial animus.  Ultimately, however, we conclude that the totality of Aaron's experiences is insufficient to support a hostile-work-environment claim. We consider both the discrete acts upon which Aaron relies and Aaron's knowledge of the use racial slurs in the workplace.[11]

First, with respect to the extension of her probationary period, Aaron has not provided any evidence, except her own subjective belief, that this action was racially motivated.  The record demonstrates that Caucasian agents also had their probationary periods extended while employed by the ABC Board.  For instance, Lieutenant Turner, a Caucasian female, testified that her probationary period was extended by the ABC Board.  Turner also pointed to other Caucasian agents whose probationary periods were extended, including Rogers's son, who had his probationary period extended due to his attendance at the same training academy

---

[11] Again, we assume without deciding that discrete acts of disparate treatment may be used in analyzing a hostile work environment claim.

36

that Aaron went to.  Under these circumstances, Aaron has not shown that the extension of her probationary period demonstrates any discriminatory intent.

Next, the circumstances surrounding Aaron's transfer from the Drug Unit to District 10 do not support an inference of racial animus.  During her tenure with the Drug Unit, Aaron became pregnant and was no longer able to perform her undercover duties.  After being placed on light duty, Aaron was transferred to District 10 because her position in the Drug Unit was paid by a grant that required her to perform undercover work.  Aaron admitted that she was not able to perform undercover work due to her pregnancy.  Although Aaron was transferred to District 10, she was not forced to relocate because District 10 is in the same building as the Drug Unit.  Aside from her suggestion that the transfer was racially motivated, Aaron has come forward with no evidence that the decision was made due to racially discriminatory motives.  In addition, in her affidavit filed in opposition to summary judgment, Aaron indicated that she believed that the transfer was "sex discrimination," not race discrimination.

Aaron also suggests that the ABC Board's failure to select her as a trainer is evidence of disparate treatment based on her race.  Aaron asked a sergeant and a captain at the ABC Board if she could serve as a trainer for other agents.  During the conversation, Aaron informed them that she was a crew leader in the military.  In response to her inquiry, Captain Patton (African-American) explained that no

37

formal procedure existed that allowed agents to apply to be trainers. According to Patton, trainers were merely chosen. Although this conversation may suggest that discrimination could play a role in selection of trainers, Aaron did not point to any specific instance in which alleged discrimination took place. Based on these circumstances, Aaron cannot establish that the failure to be selected as a trainer was based on her race.

With respect to her 2009-2010 performance appraisal, Aaron asserts that she received lower scores from her then-supervisor, Lieutenant Davis, while she was out on FMLA leave. Although Aaron believed that she was deserving of higher scores, her performance appraisal score of 25 was on the high end of "meets standards." Davis scored Aaron only 1.7 points below "exceeds standards." Presumably, if Davis desired to discriminate against Aaron based on her race, he could have rated her work performance as "does not meet standards" or "partially meets standards," options that were both available on the performance appraisal form. Aaron's belief that she was entitled to a higher score, without more, does not evidence any racial animus.

Aaron also suggests that the implementation of new workplace rules in District 10 by Davis evidences race discrimination. Aaron points to a change in the policies relating to when agents were permitted to take breakfast and work out. We reject Aaron's suggestion that the implementation of these policies was

38

somehow discriminatory, as the policies applied equally to all District 10 agents, regardless of race.

On the other hand, and viewing the evidence in the light most favorable to her, we conclude that Aaron has pointed to two discrete acts that reasonable jurors could find suggest racial animus on the part of the ABC Board. First, Aaron's selection to work store security detail assignments during a college-football game day when she returned from FMLA leave for knee surgery, may support an inference of discrimination. Aaron had already volunteered for similar details before she went out on FMLA leave but was required to work weekends to make up for the work that she had missed while out on leave. Another Caucasian agent, Brian Hand, had not worked a football-game detail the entire season. Based on this evidence, a jury could find that the decision to assign Aaron to this security assignment was evidence of disparate treatment based on race.

Second, the increased scrutiny of Aaron's work performance by her supervisor may evidence the ABC Board's discriminatory intent. During her employment, Aaron noticed that Davis began returning her paperwork with multiple red marks and that he also closely scrutinized another African-American agent's reports. Aaron identified two Caucasian agents, Jeremy Peterson and Craig Shook, to whom Davis did not return paperwork with similar red marks, despite serious errors on their documents. Davis's treatment of Aaron and co-worker

39

McKitt, in contrast to the Caucasian agents, may support an inference of discriminatory intent.

Ultimately, we find that Aaron has set forth two discrete acts that could support her allegation of disparate treatment based on race. In addition to these discrete acts, Aaron claims that she experienced and knew of the use of racial slurs and other offensive and racially insensitive conduct. Despite Aaron's claims of harassment, she admits that she never saw any racist symbols or graffiti while employed by the ABC Board. Aaron also testified that, unlike Perry, she never saw any Confederate flags at work. Similarly, Aaron admitted that she never heard any employee make a racially insensitive joke, and she could not recall hearing any references to the KKK. Finally, Aaron conceded that she never heard any employees use the "n-word."

Nevertheless, Aaron was allegedly aware of the use of racially charged language. But, before turning to the racially charged language upon which Aaron relies to support her claim, we pause to note that we make no finding as to whether the remarks presented by her were actually uttered. Instead, we merely assume, as we must, that the facts as presented by Aaron on appeal are true.

First, Aaron testified that she directly heard Administrator Folmar refer to a warehouse employee, J.C. Caldwell, as "monkey." More specifically, Aaron stated that she heard Folmar say, "He's over there working like a little monkey." Other

40

than this serious instance of unacceptable behavior by no less than the Administrator of the entire department, Aaron could not recall hearing any other racially offensive language directly.

Aaron did state, though, that she knew of co-workers who heard racially insensitive language in the workplace. Some of these employees shared their experiences with Aaron during her employment, furthering her opinion that the ABC Board permitted supervisors to openly display their racist attitudes. For instance, after Aaron filed her charge of discrimination, Lieutenant Hill told Aaron that Rogers had referred to her in a derogatory manner and had exclaimed that "niggers were always wanting something for nothing." The fact that Rogers made such a declaration is substantiated by other employees and by the fact that Rogers later sent e-mails stating that "some people want something for nothing." We regard this remark as serious and extremely offensive, and it is even more so since it was allegedly uttered by the Chief.

Additionally, Sergeant Richard Holston informed Aaron that, during the investigation of a man who allegedly stole alcohol from the ABC warehouse, Folmar told him that he "wanted the nigger hung from a light pole." This is another incredibly offensive and unacceptable remark allegedly made by the man charged with leading the ABC Board. Aaron was also aware of an incident relayed to her by co-worker Steve McKitt in which Rogers allegedly used the word

41

"nigger" when quoting a line from the movie *Full Metal Jacket*.  The quotation from the movie was, "There is no racial bigotry here.  I do not look down on niggers, kikes, wops or greasers.  Here you are all equally worthless."  Like Perry and Taylor, Aaron also states that she was aware that Rogers and Folmar were rumored to use racial slurs.

Aside from these incidents—none of which are acceptable if true, Aaron also points to additional comments relayed to her by co-workers.  But it is not possible to infer from the record that Aaron knew about these comments prior to filing suit.

Finally, Aaron seeks to rely on the instances of racism experienced by Perry.  In support of her own hostile-work-environment claim, Aaron points to the fact that Perry testified that she heard a reference to the Ku Klux Klan and saw a Confederate flag at work.  But once again, the record does not allow us to infer that Aaron was aware, prior to filing her complaint, of the instances upon which Perry relied to support her hostile-work-environment claim.  Because Aaron has not sufficiently established that she knew of these events before filing her lawsuit, we cannot consider this evidence with respect to Aaron's claim.  It bears repeating that if Aaron was not aware of this racially charged conduct at the time she filed her Complaint, it could not have contributed to any subjective belief at the time of her

42

employment that she was exposed to a hostile work environment. *See Adams*, 754 F.3d at 1250 and *Edwards*, 49 F.3d at 1522.

We expressly condemn the reprehensible and serious nature of the remarks recounted by Aaron. But as despicable as the alleged conduct is—and it certainly is despicable—taking the evidence in its entirety, we cannot conclude that the incidents experienced by Aaron could lead a reasonable jury to conclude that she suffered the type of severe and pervasive sustained harassment over her five-and-one-half years of employment that rises to the level of a hostile work environment. *See e.g., Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 585-86 (11th Cir. 2000) *overruled on other grounds by Burlington*, 548 U.S. at 53, 126 S. Ct. at 2405; *Mendoza*, 195 F.3d at 1247. During her employment, Aaron knew about a total of six specific instances of racially harassing conduct. That included two discrete acts that could be considered disparate treatment—the assignment to a store security detail and receiving papers with multiple red marks on them. And she was aware of four racially charged remarks but heard only one of these remarks directly.

Without question, this type of disgusting language and sentiment has no place in any work environment. But other than the one comment that Folmar allegedly made, Aaron did not hear any racially charged remarks firsthand. And Aaron was aware of only three other instances where racially charged language supposedly was used. Although no magic number exists to enable a plaintiff to

43

establish the harassment necessary to make out a hostile-work-environment claim, it is the "repeated incidents of [] harassment that continue despite the employee's objections [that] are indicative of a hostile work environment." *Miller*, 277 F.3d at 1276 (internal quotations and citations omitted). While we condemn the extremely offensive nature of these types of incidents, the record does not evidence the type of concentrated harassment necessary to sustain a hostile-work-environment claim under our precedent. *See e.g., Adams*, 754 F.3d at 1255-56.

It does not escape us that nearly all of the instances of racial intolerance and bigotry were allegedly displayed by supervisors—Administrator Folmar and Chief Rogers. And, as we noted in *Adams*, the use of a racial slur by supervisors imparts with it a greater sense of severity. *See Adams*, 754 F.3d at 1254 (noting that although the plaintiff heard a racial slur, "he did not offer evidence that a supervisor used the word or that anyone directed it toward him"). Where a plaintiff's own supervisor engages in racial bigotry, including the use of racial slurs, the harassment is that much worse. Indeed, these individuals make decisions that directly affect the terms and conditions of a plaintiff's employment—hiring, firing, promotion, and reprimands. Unlike when a plaintiff suffers harassment by a co-worker, she cannot merely "walk away" from a supervisor to escape the harassing conduct.

But here, the relatively infrequent incidents, taken together over the course of the five-and-a-half-year period of Aaron's employment with the ABC Board would not lead fair-minded jurors to conclude that Aaron suffered severe and pervasive harassment sufficient to alter the terms or conditions of her employment, as that standard is construed in this Circuit. *See e.g., Gupta*, 212 F.3d at 585-86; *Mendoza*, 195 F.3d at 1247. No evidence exists that Aaron felt physically threatened by the harassment. Likewise, the evidence does not suggest that the alleged harassment prevented Aaron from performing her job. Ultimately, we conclude that Aaron has not presented a genuine issue of material fact as to whether the alleged harassment that she faced was objectively severe or pervasive enough to establish the fourth element of a *prima facie* case of a racially hostile work environment.

## V.

Because we conclude that no genuine issue of material fact exists as to Appellants' claims of a racially hostile work environment, we affirm the district court's grant of summary judgment in favor of the ABC Board on these claims. But we find that Perry presented sufficient evidence to preclude the entry of summary judgment with respect to her retaliation claim. We therefore vacate the summary judgment against her on this claim.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART**.

45